UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

CHARLES D. JACKSON,

                                    Plaintiff,                    5:10-CV-01362
            vs.                                                   (NAM/DEP)

THE SYRACUSE NEWSPAPERS,

                                    Defendant.
_____

**APPEARANCES:**                              **OF COUNSEL:**

CHARLES D. JACKSON
113 East Borden Avenue
Syracuse, New York 13205
*Plaintiff, Pro Se*

JACKSON LEWIS, L.L.P.                         Matthew H. Woodard, Esq.
One North Broadway, 15th Floor                Greg A. Riolo, Esq.
White Plains, New York 10601
*Attorneys for Defendant*


**Norman A. Mordue, Senior United States District Judge**:

**MEMORANDUM-DECISION AND ORDER**

## I.      INTRODUCTION

        The present case is one arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §

2000e *et seq.* ("Title VII") and the New York Human Rights Law, N.Y. Executive Law § 290 *et

seq.* ("NYHRL").  The complaint alleges race discrimination and retaliation under both federal and

state law.  Defendant moves presently for summary judgment to dismiss plaintiff's complaint and

the *pro se* plaintiff opposes defendant's motion.

## II.     RELEVANT FACTUAL BACKGROUND

        The following facts are taken from the complaint and from defendant's Statement of

Undisputed Material Facts. Unless specifically noted, plaintiff has admitted the truth of these facts. Defendant publishes THE POST-STANDARD, a daily newspaper of general circulation in the Central New York area. The Company also supplies content to an online affiliate, SYRACUSE.COM. The Company's office is located in the heart of downtown Syracuse, New York.

Plaintiff is African-American. He grew up in the Syracuse, New York area and graduated from Henniger High School. During his junior year of high school, plaintiff enrolled in a journalism class that was taught by defendant. Upon completing the course, plaintiff applied for and was awarded a Minority Journalism Scholarship to attend the S.I. Newhouse School of Public Communications at Syracuse University on a full scholarship. The scholarship was funded by the Company and Syracuse University to promote inclusion of minorities in the field of journalism. During his college career, starting in or about August 1987, plaintiff intermittently worked at the Company as an Intern.

After plaintiff graduated in1991, defendant hired him to work as a Reporter in the regional bureau. Plaintiff worked as a Reporter for the next few years covering topics such as crime and police activity, courts, education, agriculture, and other assigned matters in the Central New York area. In 1995, plaintiff began working in the Company's CNY Features Department and he carried out various job duties in this department until his employment was terminated in 2009.

In 1995, plaintiff worked as a Reporter covering local entertainment, and he remained in that role until 1998, at which time he was transferred to a "Copy-Editor-in-training" position. Defendant asserts that plaintiff's transfer to Copy-Editor-in-training was "due to several performance issues that were all addressed with him." Defendant contends that plaintiff later transitioned to a regular Copy Editor and he remained in that position until the time of his

termination. Plaintiff states that he was told there was "more of a need for copy editors" and the duty of copy editing was simply added to his reporting duties.

In his role as a Copy Editor in the CNY Features Department, defendant asserts that plaintiff's primary job duty was to edit content covering local entertainment for the Company's newspaper and affiliated website. Specifically, plaintiff was responsible for tasks such as editing copy, setting page layout, writing headlines, placing stories on pages, and meeting production deadlines. Plaintiff argues that copy editing was not his primary responsibility. Indeed, plaintiff states he held several positions simultaneously as a journalist. Plaintiff alleges that he performed copy editing duties as well as reporting duties, wrote a column, and was in charge of a Saturday page.

Defendant acknowledges that plaintiff called on local bars, restaurants, entertainment venues, musicians and artists so their upcoming events could be published. In addition, plaintiff coordinated with the Company's photographers so pictures of certain events could be taken for the publication. Defendant also acknowledges that for approximately 8 years, from about 2000 to 2008, plaintiff wrote a short column about music technology, called "Key Notes." The column was published once per month and it took plaintiff roughly 4 to 8 hours to compose.

However, defendant contends that plaintiff's primary function from 1998 until his termination in 2009 was as a Copy Editor. He spent the majority of his time each week performing these job duties. Again, plaintiff denies these allegations.

From 2000 to 2008, plaintiff's supervisor was Gina Ogden. Plaintiff's complaint alleges that his career "flourished" while Ogden was his supervisor. Features Editor Emily Kulkus (then-Assistant Features Editor) began supervising plaintiff's work on the Weekend section of the

newspaper in 2006, which was the majority of his job in that time frame, and she became his direct supervisor from 2008 until his employment was terminated in 2009. Plaintiff was trained on many occasions on how to perform his job duties as a Copy Editor. A lot of plaintiff's training was conducted by Copy Chief Marjorie Chetney. The training plaintiff received was conducted in both group and one-on-one settings. The training was provided on any new updates, such as new editing formats or coding, and also on an as-needed basis for plaintiff.

During plaintiff's employment, defendant asserts it was not the Company's practice to conduct formal written performance evaluations. Instead, defendant claims it was the Company's practice for supervisors to conduct a verbal job discussion plan with employees every six months and also to conduct verbal coaching and counseling meetings with employees on an as-needed basis. Plaintiff denies this claim and asserts the Company made exceptions "for a white employee."

Plaintiff acknowledges having meetings with his superiors regarding errors that he made throughout his employment which were conducted as "preventative measures to not repeat the error." It was the Company's protocol for supervisors to discuss errors with employees. The purpose of the discussion was to identify the error and take preventative measures so the error would not be repeated.

Defendant states that it's history of taking preventative measures to correct plaintiff's job performance errors dates back to at least 1998. In June 1998, plaintiff was arrested on a charge of soliciting a prostitute. After his arrest, plaintiff sent a letter via facsimile to the Chief of the Syracuse Police Department on the Company's letterhead identifying himself as a reporter for the Company and requested a pardon explaining that he was performing research for a book at the

time of his arrest.  Plaintiff was not on a Company sanctioned assignment when he was arrested.

He was not authorized to use the Company's letterhead for such purely personal reasons.  He did

not subsequently publish a book regarding the "research" he was conducting at the time.  The

Syracuse Police Department notified the Company's Executive Editor, Mike Connor, of plaintiff's

letter.  Mr. Connor called plaintiff into a meeting to discuss the situation.  Mr. Connor was upset,

told plaintiff that he should not have sent the letter on company letterhead and that doing so was a

dismissible offense.  Plaintiff admitted his egregious misconduct in this incident and he apologized

to Mr. Connor.  In spite of plaintiff s misconduct, his employment was not terminated. Indeed, Mr.

Connor never mentioned the arrest again during plaintiff's employment and actually helped

plaintiff resolve the situation with the police.

　　　　While plaintiff admits to the facts concerning his arrest and sending the fax to the Chief of

Police, he denies this incident is evidence that he ever had "job performance" issues.  He claims

that "[his] errors and isolated incidents were trumped up to enhance defendant's poor job

performance storyline."

　　　　Defendant asserts that plaintiff had other noted performance deficiencies in 1998.  He told

a reader that he had won tickets to a Backstreet Boys concert when, in fact, there were no more

tickets available.  The reader was very upset by the situation and complained to the Company. This

situation was addressed by supervisor Mary Fran Devendorf, former Human Resources Director

Jean Kern, and Weekend Editor Peter Schaffer.  Plaintiff claims this allegation is false and taken

out of context.

　　　　Another error which plaintiff made in the same time frame was an inaccurate night club

event listing that prompted a reader to submit a letter of complaint.  He also missed a production

deadline. These issues were addressed with plaintiff by Mr. Schaffer, Ms. Devendorf and supervisor Michael Hirsch. Mr. Connor also met with plaintiff twice in September 1998 to discuss his misconduct and performance problems. Mr. Connor discussed his concerns about plaintiff using "very poor judgment in his handling of contest tickets," using "his affiliation with the newspaper in a highly improper way" in connection with his arrest, and failing "to perform on his reporting beat, which led [the Company] to move him to a copy-editor-in-training position." Moreover, Mr. Connor told plaintiff that based on his misconduct and performance problems he did not seem to be a "good fit" for the business. As a result, he told plaintiff to go home and think about his future with the Company and report back. Plaintiff categorically denies all of these allegations with no citation to the record as required by Local Rule 7.1 (a) (3). Pursuant to this rule, **the Court deems any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert. (emphasis added).**[1]

Despite the seriousness and variety of these issues, and the multiple different supervisors who addressed these issues with plaintiff, he felt he was being "singled out," but plaintiff nevertheless decided to continue working for the Company in his new role as Copy-Editor-in-training in the CNY Features Department. Defendant contends that plaintiff encountered further performance related issues and errors in his new role. These issues were addressed with him as needed, such as failing to ensure that winners of a weekend contest were contacted in a timely manner; failing to notify his supervisors when he was out sick; inaccurate night club event listings; page formatting and coding errors; and errors regarding photo

---

[1] In addition, during his deposition on January 23, 2012, plaintiff admitted that Connor made these statements when confronted with a memorandum in which Mr. Connor documented his meetings with plaintiff in September 1998.

assignments.  Plaintiff argues that these were not performance deficiencies, but rather "errors and/or isolated incidents that defendant trumped up."  Plaintiff contends he was not aware that defendant would use these resolved incidents against him 11 years later to enhance the Company's alleged "job performance" claims against him after he filed an employment discrimination claim with the state.

In the 2006 to 2009 time frame, the Company met with plaintiff on numerous occasions to discuss his errors and to suggest preventative measures.  These meetings were conducted by Ms. Kulkus, Ms. Chetney, Arts Editor Melinda Johnson, Managing Editor Janis Barth, and Mr. Connor.  Plaintiff states that **all** employees who made errors met with their supervisors.  When Ms. Kulkus began supervising plaintiff s work in 2006, she immediately noted performance problems. Specifically, Ms. Kulkus noted that the production deadlines for plaintiff's night club event listings had been "consistently missed for four weeks."  Ms. Kulkus was concerned because "the deadlines are not optional."  Plaintiff states that while he did miss deadlines occasionally, "that was only because [he] had deadlines that crossed each other.  Never was this brought to [his] attention that they were "performance" issues.  Plaintiff asserts that "[w]e met to readjust the schedule based on the variety of tasks that I did simultaneously."  Plaintiff states that defendant "habitually leaves out key information regarding they're [sic] reports on my errors that they trump into job performance deficiencies."

Due to plaintiff s failure to meet production deadlines, Ms. Kulkus and Ms. Ogden repeatedly met with plaintiff, throughout 2006 and 2007, in an effort to improve his workflow and production schedule so he would be more efficient.  Ms. Kulkus set goals for plaintiff and notified him that deadlines are "not meant to be broken."  Defendant contends that "plaintiff understood

7

that meeting deadlines was critical due to the nature of his job, and that missing deadlines could negatively impact the whole operation of his department."  Plaintiff denies this allegation.  He states that he, Kulkus and Ogden "discussed ways to adjust the schedule based on the other tasks he was doing."

Defendant asserts that Ms. Kulkus also counseled plaintiff about not using his time well and spending too much time on routine tasks such as his club event listing assignment.  According to defendant, it would take plaintiff 14 to 16 hours per week to complete his club listings.  However, when Ms. Kulkus handled the task once while plaintiff was on vacation, she started from scratch and it only took her 10 hours.  Plaintiff states that Kulkus did not counsel him - she "harassed" him.  He contends that putting together the club listings was a two and half day job that he only had two days to complete.  Plaintiff states that Kulkus failed to acknowledge that when he went on vacation, he did eight hours of preparatory work for her on the club listings before he left.  Consequently, her claim that it only took her 10 hours to complete the club listings job was disingenuous.

Plaintiff was also counseled by Ms. Kulkus regarding various issues involving poor work quality and performance, such as failing to keep up with production schedules, failing to set and meet goals, repeatedly missing deadlines, coding and formatting errors, using the wrong color in photos, incomplete photo assignments, incorrectly laying out stories.  Plaintiff characterizes these allegations as Kulkus "harass[ing] [him] regarding errors."  To wit, plaintiff states "[he] never had a supervisor in [his] 21 years of employment with defendant that was obsessed with every error [he] made and isolated incidents.  And outside of that, she even went so far as to bring in elements from [his] personal life to use against [him.]

Ms. Kulkus counseled plaintiff on many occasions regarding repeated inaccuracies or errors in his reporting on night club and other event listings. Plaintiff states that most of these errors were not his fault and were based on misinformation given to him by others. Plaintiff states that Kulkus treated Patti McNeil Booth, who was white, differently when she took over the club listings job and defended her making errors stating that "people do give wrong information." Defendant acknowledged that sometimes an event host provided plaintiff with inaccurate or incomplete information, and he would not be faulted for relying on such misinformation. However, the Company received several complaints about plaintiff's errors from various external sources including night club managers and owners, bands, promoters, and disc jockeys. Plaintiff denies these allegations. Ms. Kulkus and Mr. Schaffer also addressed with plaintiff concerns about him providing insufficient or inaccurate information in assignments to the Company's photographers. Plaintiff also denies these allegations.

As Ms. Kulkus supervised plaintiff s job performance, she documented the issues that she addressed with him on a regular basis. Some of the issues included: errors in club listings; photo assignments being vague, incomplete, or not reported; showing minimal attention to detail; the "chaotic" nature of the flow of his information; and his ineffective "Cheap Eats" column. Plaintiff acknowledges that Kulkus addressed "errors and issues" with him, "but it was never framed as job performance issues." He says he "was not aware of this in 'poor job performance' context until after [he] filed with state."

As time went on, plaintiff repeatedly made the same errors and also made more serious errors. As a result, Ms. Kulkus sought assistance from the Company's Human Resources Director, Annette Peters, to address plaintiff s performance problems.

9

In November 2008, Ms. Kulkus met with Plaintiff to discuss "three major errors" he had made, and later reported this conversation to Ms. Peters. These errors were: (1) publishing the same Dear Abby and Billy Graham columns in both the Friday and Saturday editions of the newspaper; (2) writing a headline that did not match the accompanying story in the Sunday edition; and (3) failing to include a story that was scheduled to be published in the Friday edition. Ms. Kulkus also re-addressed plaintiff's editing error of a "missing jump," i.e., he included the first part of a story on one page of the newspaper but then omitted the continued part of the same story that was supposed to be printed on a subsequent page. Plaintiff denies these were "major" errors. He states they were "trumped up."

During their meeting in November 2008, Ms. Kulkus told plaintiff that his performance was unacceptable; his work had to be exact, accurate and precise based on the time allotted to complete his tasks. Ms. Kulkus met with plaintiff two more times in December 2008 to address two more errors: (1) plaintiff supplied the incorrect color of a photograph that ran in the newspaper, which was the same error he had previously made and been counseled on, by Ms. Kulkus, on several occasions; and (2) plaintiff failed to notice incorrect formatting for a story that ran in the newspaper. Plaintiff denies these allegations and states that this was continued "harassment" by Kulkus. He denies he had "performance issues" and claims that defendant continued to "trump up" minor errors into major problems. However, Ms: Kulkus reported the two incidents in December 2008 to Ms. Peters. Plaintiff acknowledged both errors and said he would be more careful.

Plaintiff requested to take vacation during the full Christmas holiday week in December 2008, however, his request to take the full week off was denied. During the holiday

period of Thanksgiving through New Year's Day of 2008 to 2009, Ms. Chetney, the Assistant Desk Editor for the Features Department, one of plaintiff s supervisors, was out on maternity leave. As a result, the department was short-staffed and could not afford to have any of the Copy Editors take vacation for the entire Christmas holiday week. Under the Company's vacation policy, plaintiff was entitled to up to 25 days of vacation in 2008. According to the 2008 vacation log for the Features department, plaintiff was granted approximately 33 days of vacation that year on or about the following days: February 18-22, April 25, April 28-May 2, June 27, June 30-July 4, July 7, August 1, August 8, August 11-12, August 25-29, September 22-26, and December 26. Thus, plaintiff was granted vacation on the following federal holidays in 2008: Washington's Birthday (2/18/08) and Independence Day (7/4/08). He also took vacation on the day after Christmas (12/26/08). Plaintiff was the only Copy Editor who took any time off during the 2008 to 2009 holiday season (Thanksgiving through New Year's Day).

In January 2009, Ms. Kulkus met with plaintiff to address two more errors and she reported the meeting to Ms. Peters. This time, plaintiff again ran a headline that did not match the story and he published Sunday's movie times in the Friday edition of the newspaper. Plaintiff explained that these mistakes occurred because he was in the "catch 22" of having to get his job done right while moving fast enough to finish his work.

Then, in February 2009, Ms. Kulkus met with plaintiff after he again ran the same Billy Graham column two days in a row, despite previous counseling about this problem where Ms. Kulkus and plaintiff devised, and plaintiff pledged to use, a certain process to prevent this type of error. Plaintiff acknowledged the repeated error and explained that he was working too fast and used a flawed shortcut. At the meeting in February 2009, Ms. Kulkus also addressed with plaintiff

11

his response to an incident in which he forgot to send a centerpiece story to Syracuse.com.  Ms. Kulkus felt that plaintiff responded rather "nonchalantly," by stating it was okay that he "forgot" and that "it happens."  Plaintiff acknowledged that the story did not get to the site, but claims it was a "newsroom-wide problem."  Plaintiff also said he was not as emotional as others about making mistakes.

As a result of plaintiff's ongoing performance problems and repeated errors, Mr. Connor, called plaintiff into a meeting in his office on February 13, 2009, and he subsequently reported the meeting to Ms. Peters.  Plaintiff denies this allegation.  He states the meeting related to "errors" not "job performance" and that "these are two different things."  During the meeting on February 13, Mr. Connor reviewed with plaintiff the series of serious errors he had recently made in copy editing, i.e., publishing identical columns two days in a row, missing production deadlines, failing to send a story to the affiliated website, running movie times on the wrong days, and other errors.[2]  Plaintiff acknowledged his mistakes, explained that he felt rushed or short on time when they occurred, and said he had taken steps to prevent errors, like publishing the same column twice, from happening again.  Plaintiff denies that these mistakes were "serious errors."

Mr. Connor told plaintiff it was his job as a Copy Editor to prevent such mistakes from occurring, not to actually create them, and to speak with his supervisors in advance if he was short on time rather than use that as an excuse after something bad happens.  Mr. Connor also told plaintiff that such sloppy work could not be tolerated, and that if he made another error he would lose his job.  He further notified plaintiff to "consider this an official warning."  Plaintiff told Mr.

---

[2]

During his deposition, plaintiff acknowledged that he discussed his error in publishing the same  column two days in a row with Mike Connor but the other referenced errors were discussed with Emily Kulkus.

12

Connor that he was "glad" they had spoke and "appreciated knowing where he stood in his job."[3]

On February 23, 2009, Ms. Kulkus met with plaintiff in follow-up to his meeting with Mr. Connor. Plaintiff said he was surprised to hear directly from Mr. Connor about the errors he had made. Plaintiff acknowledged that Mr. Connor and Ms. Kulkus had told him his errors were serious. Plaintiff also said he understood that they viewed his errors as serious and that further errors could result in him losing his job. Plaintiff, on the other hand, thought his errors were minor. Ms. Kulkus told plaintiff that she was committed to helping him move beyond the situation and prevent more serious errors in the future, and she continued trying to help plaintiff avoid errors. Plaintiff said he would continue trying to do his best. Ms. Kulkus also discussed a coding error Mr. Connor had brought up of which she and plaintiff were not aware. Ms. Kulkus offered to look into that specific error further so it could be addressed, but plaintiff declined. He thought Ms. Kulkus was setting him up for failure but he did not tell anyone about his belief at that time.

On March 19, 2009, plaintiff was responsible for producing a three-page section of the newspaper. The production process ran late despite several discussions about the progress of the pages between Ms. Barth, Ms. Kulkus and plaintiff. Plaintiff states there was "little to no discussion with Kulkus or Barth during the process of laying out the page." Afterward, Ms. Barth and Ms. Kulkus met with plaintiff to discuss the situation. During this meeting, plaintiff acknowledged that he was responsible for producing the pages, that he did not spend his time wisely that day, that production did not progress as it should have, and that the process that occurred was unacceptable on many fronts. Plaintiff contends that "a lot of detail is left out of this report including the fact that Emily was part of the reason that the section was held up that day."

---

[3] Plaintiff also acknowledged the truth of these allegations during his deposition.

13

Ms. Kulkus wrote up a summary of this meeting, reviewed it with plaintiff who confirmed its accuracy, and then she sent the summary to Mr. Connor and Ms. Peters.

Thereafter, in April 2009, plaintiff continued making significant errors which culminated in the termination of his employment. In mid-April 2009, Ms. Chetney caught another error plaintiff had made when she noticed that three identical columns which had appeared in the newspaper the day before - Dear Abby, Dr. Donohue and Billy Graham - were on page proofs ready for review by an editor. This is the final step in the production process before the page is sent to publication. Ms. Chetney immediately brought plaintiff s error to his attention so it could be corrected before the page was sent for publication. If plaintiff's error was not caught and corrected, the same columns would have run on two consecutive days yet again. This is the same error plaintiff made and was counseled on in November 2008 and again in February 2009.

A short time later on April 23, 2009, plaintiff was responsible for two pages in the Friday edition. As the day progressed, Ms. Kulkus and Ms. Chetney both realized that the pages were not coming together as they should have been and were behind schedule. Plaintiff was taking too long to complete the work and made several errors. As a result, they stepped in and corrected plaintiff's formatting and layout errors, as well as the organizational problems, and ensured that the production deadline was met. Plaintiff denies this allegation. He states Ms. Chetney told him to be "creative" with the layout. He states he was responsible for the art on the page as well because Ms. Chetney was out for the day.

In response to plaintiff's additional errors in April, he was called into a meeting with Mr. Connor and Ms. Kulkus at 5:10 p.m. on April 28, 2009. At that time, plaintiff anticipated that his employment would be terminated, so he packed up his desk and brought his belongings with him to

14

the meeting.  Plaintiff denies this allegation.  He says he believed his termination was imminent "because of Emily's lies, not [his] errors."  During this meeting, Mr. Connor reminded plaintiff of their February 13, 2009, meeting in which plaintiff was issued a final warning to improve his performance and was directed to stop using the faulty shortcut that resulted in him repeatedly publishing the same columns on consecutive days.  Plaintiff stated he remembered and understood that discussion, and acknowledged making the same error again by using the same faulty shortcut he had pledged to stop using.  He said he had caught the error before Ms. Chetney did and was planning to correct it, but admitted he had not told anyone.

In response to this allegation, plaintiff states there was never any discussion about "job performance" in this meeting.  Rather, he says that the discussion on April 28, 2009, was a reminder about "errors [he] made," and the "warning that if [he] made a another error he could lose [his] job."  At the end of the April 28, 2009, meeting, Mr. Connor told plaintiff that this was a "very serious matter," and that he would "review the situation and let him know what's next."

After the meeting, Mr. Connor and Ms. Kulkus sent e-mails to Ms. Peters summarizing plaintiff's recent performance problems and what was discussed during the meeting they held with him.  Ms. Kulkus also sent her e-mail to Ms. Barth.  Also, on April 28, 2009, after their meeting with plaintiff, Mr. Connor and Ms. Kulkus met with Ms. Peters to discuss plaintiff's repeated errors and performance problems.  At this meeting, defendant asserts that the decision was made to terminate plaintiff's employment because of his poor job performance.  Plaintiff denies all of these allegations.

In 2009, it was the Company's practice to conduct employment terminations in person at the end of an employee's work shift.  Accordingly, during their meeting on April 28, 2009, Mr. Connor

15

and Ms. Peters agreed that plaintiff would be notified of his termination in a meeting toward the end of his shift the next day on April 29, 2009. Plaintiff denies this.

Plaintiff went to work on the morning of April 29, 2009, and delivered to the Company two letters which he had written. He gave copies of the letters to Ms. Peters in the hallway without discussing them and left copies for Mr. Connor at his desk or reception area. Plaintiff's letters were dated March 20, 2009, and April 28, 2009. Despite the dates noted, plaintiff did not deliver them to the Company until April 29, 2009. At that time, plaintiff had a "firm belief that a decision has been made - or is being made - to let [him] go." Plaintiff wrote his March 20, 2009, letter in response to the final warning Mr. Connor gave him because he anticipated being terminated and wanted to explain several errors he had made. Plaintiff admitted making errors because of reasons such as: "rushing and/or not communicating thoroughly;" "spending too much time on some items;" "occasional bad judgments;"tending to"read through stories at a slower pace than [his] colleagues;,not using his time wisely; and making a "bad judgment call."

Plaintiff wrote his April 28, 2009, letter in response to his meeting with Mr. Connor and Ms. Kulkus that day. In this letter, plaintiff admitted to using the faulty shortcut which he had previously pledged to stop using because it had resulted in identical columns being published on consecutive days. He pointed out that the mistake was caught in time and suggested he should not be terminated as a result, but acknowledged Mr. Connor's prior warning not to make the mistake again. Despite admitting numerous errors in his letters, he stated that he felt he was not treated the same as others and was targeted to be fired. Plaintiff now claims that, although neither of the letters mentioned that race was the reason for any alleged unfair treatment, he assumed his superiors knew he was raising concerns about race discrimination simply because they knew he was black.

16

Mr. Connor and Ms. Peters reviewed plaintiff's letters and discussed them with each other on the morning of April 29, 2009. Mr. Connor then met with Ms. Barth, Ms. Chetney and Ms. Kulkus to discuss the issues plaintiff raised in his letters and his performance problems that resulted in the decision the night before to terminate his employment. After conferring with Ms. Barth, Ms. Chetney and Ms. Kulkus, Mr. Connor concluded that plaintiff's concerns and explanations for his errors raised in his letters did not alter the decision to terminate his employment.

Toward the end of plaintiff's shift on April 29, 2009, Mr. Connor and Ms. Barth called plaintiff into a meeting in Mr. Connor's office. During this meeting Mr. Connor notified plaintiff that his employment was terminated and that he would be given severance. Plaintiff received a voluntary severance payment of $47,936 from the Company. Mr. Connor explained to plaintiff that his termination was based on the errors that he continued to make even after he was placed on a final warning. Plaintiff raised some of the same issues he had mentioned in his letters, such as how his last error of using the faulty shortcut he pledged not to use was caught prior to publication, and how he felt his termination was unfair because others made errors and were not terminated. In response, Mr. Connor restated to plaintiff the reasons for his termination. The meeting was brief and Mr. Connor did most of the talking. The pending tasks plaintiff was handling were reassigned and he turned in his ID badge and left the building with his belongings.

Plaintiff states there is "no documented proof" these individuals met the night before his termination. Plaintiff was not aware this meeting had occurred. Plaintiff denies these allegations on the ground that he was not included in the meeting or aware that it occurred. Plaintiff admits making numerous errors during his employment, and that Mr. Connor and Ms. Kulkus told him on multiple occasions that he made "major"' or "serious" errors at the time they occurred. Plaintiff

17

denies this allegation. He states that he only acknowledged that the **Company** viewed his errors as major and he would do his best to prevent them in the future. Moreover, plaintiff downplays the significance of his errors, claiming they were "minor" and not "egregious."

Defendant contends that plaintiff is not the only employee whom the Company terminated for poor performance in the 2008 to 2009 time frame. Specifically, defendant claims that it Diana LaMattina, a white Reporter, was terminated by Mr. Connor due to unsatisfactory performance in July 2008. Plaintiff denies this allegation is relevant to his claims in the present action. He states he was "not terminated for poor performance." Rather, he claims defendant terminated him due to his errors. According to plaintiff, "everyone makes errors." "Defendant attempts to tie errors into job performance - however [his] white colleagues made repeated and egregious errors and they were not treated as harshly as [he] was."

With the exception of plaintiff's claims in this case, which were raised after the termination of his employment, defendant claims the Company has not received any complaints of race discrimination from any other employees for well over 5 years and that plaintiff was not replaced after his employment was terminated. Specifically, defendant asserts that the duties he performed were absorbed by others in the CNY Features Department and due to economic realities, defendant claims that the Features department is smaller now than it was when plaintiff's employment was terminated in April 2009. Plaintiff denies all of these allegations with no citations to the record or other evidentiary support.

Following his termination, plaintiff filed a complaint with the New York State Division of Human Rights ("DHR") on July 30, 2009. Thereafter, DHR conducted an investigation and a hearing concerning plaintiff's complaint of racial discrimination and retaliation. As a result of

DHR's investigation and administrative hearing, the United States Equal Employment Opportunity Office ("EEOC") issued a Dismissal and Notice of Rights to plaintiff on September 3, 2010. Plaintiff filed the present action in November 2010.

## III.    DISCUSSION

A.    Applicable Standard

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir.1994) (citations omitted).  When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36–37 (quotation and other citation omitted).  Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleading. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56 (c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) (other citations omitted).  Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions.  *See Giannullo v. City of New York*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting

convenience for facts").

In reviewing a *pro se* case, the court "must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell*, 289 F.Supp.2d 289, 295 (N.D.N.Y. 2007) (quoting *Haines v. Kerner*, 303 U.S. 519, 520 (1972)) (other citations omitted). "Indeed, the Second Circuit has stated that '[i]mplicit in the right to self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training." ' *Id.* (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). It is with these considerations in mind that the Court considers the present motion for summary judgment.

B.    Race Discrimination

*McDonnell Douglas* Analysis

The Court analyzes plaintiff's race discrimination claim under the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). The first step requires the plaintiff to prove a *prima facie* case of discrimination by showing (1) membership in a protected class; (2) possession of basic skills necessary for the job; (3) an adverse employment action; and (4) circumstances giving rise to an inference of discrimination. *See St. Mary's Honor Center v. Hick's*, 509 U.S. 502, 506 (1993).

Where a plaintiff has made out a *prima facie* case, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *See Bickerstaff v. Vassar College*, 196 F.3d 435, 446 (2d Cir. 1999). The defendant's burden of production is not a demanding one; it need only offer an explanation for the employment decision. *See id.*

The burden then shifts back to the plaintiff to show "that the proffered reason was not the

true reason for the employment decision, and that race was." *Id.* (internal quote omitted). "The plaintiff's opportunity to demonstrate that the employer's proffered reason was false [then] merges with [his] ultimate burden to persuade the trier of fact that [he] has been the victim of intentional discrimination (i.e., that an illegal discriminatory reason played a motivating role in the adverse employment decision)." *Id.* at 446-47.

Applying the first step of the *McDonnell Douglas* analysis to the case at bar, the Court notes that defendant does not dispute that plaintiff has met the first two elements of a *prima facie* case, i.e., he has shown that he is a member of a protected class, and that he possessed the basic skills of the job. With respect to the third element, an adverse employment action, plaintiff asserts that he was "subjected to "greater scrutiny" than his white co-workers, that is, that Ms. Kulkus treated him unfairly and that she was more aggressive in addressing errors he made compared to other white editors. Plaintiff alleges this discrimination occurred "during a six-month period between November 2008 and April 2009" while under the supervision of Emily Kulkus.

Under Kulkus's supervision, when plaintiff made mistakes, he claims "she constantly harassed him and "came at [him]" as if he had "committed a federal crime." Whenever she would talk to plaintiff about his errors, "the style was always condescending as if [he] was inferior to her." For example, plaintiff alleged that most times when she called him in meet with her, she would "address [him] in a condescending manner" starting off with, "What is this all about?", then adding that "This is not acceptable!" and when he would explain how something happened, she would say in a dismissive tone, "This cannot happen again!" The stress behind this ongoing treatment made plaintiff "dread coming to work everyday." Plaintiff asserts he "was on pins and needles" because "[he] knew that she was watching every move [he] made and one more mistake could cost [him his]

21

job." Plaintiff alleged that it was an "extremely hostile working environment."

Plaintiff does not deny making any of the numerous errors introduced into the record by defendant, e.g., coding errors, failing to ensure that winners of a weekend contest were contacted in a timely manner; failing to notify his supervisors when he was out sick; inaccurate night club event listings; page formatting errors; errors regarding photo assignments and plaintiff's continual failure to meet deadlines. Most notably, however, plaintiff does not deny that he prepared page proofs in which three identical syndicated columns would have run on consecutive days on three occasions based on a faulty filing shortcut he had repeatedly pledged not to use after making the same mistake. Plaintiff admitted that based on his numerous and continued errors, Emily Kulkus met with him and said she was "hoping to put this series of errors behind us" and that she was "committed to helping [him] move beyond the situation and prevent more serious errors in the future." *See*, Plaintiff's Deposition Transcript, p. 206, Attached as Ex. E. to Affirmation of Defendant's Counsel in Support of Summary Judgment. During this meeting, plaintiff said he understood and that he would try and do his best. *See id.* at p. 207.

Plaintiff also claims that defendant discriminated against him when he was in charge of updating clubs for the Weekend section. Specifically, plaintiff states that when he was in charge of updating clubs for the Weekend section, he had to call over 150 clubs, format coding and work an irregular shift (5 p.m. until about 2:30 a.m. Mondays then return by 10 a.m. Tuesdays to complete the club listings by 2 p.m.). In contrast, when a white colleague, Patti McNeil Booth was assigned to take over club listings in the Weekend section, she was not required to call over 150 clubs to update the listings, format coding and was allowed to compile clubs from faxes and emails during regular working hours (7:30 a.m. to 4 p.m.).

22

An adverse employment action is "a materially adverse change in the terms and conditions of employment," something "more disruptive than a mere inconvenience or an alteration of job responsibilities," such as "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." *Galabya v. New York City Bd. Of Educ*., 202 F.3d 636, 640 (2d. Cir. 2000) (internal quotation marks and citations omitted). Here, plaintiff does not allege or suggest that he experienced any change in status or benefits as a result of Ms. Kulkus's alleged hostility or excessive scrutiny.

Here, plaintiff has not claimed or suggested he experienced any material change to the terms and conditions of his employment - the evidence suggests only that his benefits and responsibilities remained the same. His allegations of excessive scrutiny do not change this conclusion. *See Nicastro v. Runyon*, 60 F.Supp.2d 181, 186 (S.D.N.Y. 1999) (holding that excessive scrutiny by supervisors does not constitute an adverse employment action under Title VII). Accordingly, even if Kulkus subjected plaintiff to more scrutiny than she did other editors or employees, that is not sufficiently material a change to his conditions of employment to count for Title VII anti-discrimination purposes. Unfair criticism and other unpleasant working conditions are not adverse employment actions either. *See Smalls v. Allstate Ins. Co* ., 396 F.Supp.2d 364, 371 (S.D.N.Y. 2005) (" '[B]eing yelled at, receiving unfair criticism, receiving unfavorable schedules or work assignments ... do not rise to the level of adverse employment actions ... because they [do] not have a material impact on the terms and conditions of plaintiff's employment.' " (quoting *Lee v. New York State Dep't of Health*, No. 98 Civ. 5712, No. 99 Civ. 4859, 2001 WL 34031217, at *16 (S.D.N.Y. March 26, 2001)). Thus, the written and oral criticisms of plaintiff by Kulkus, even if

unjustified, are not adverse employment actions.  Nor was it unlawful for Kulkus to allow Patti McNeil Booth to do less work during better hours on club listings as alleged by plaintiff after she took over this duty for him.  Similarly, that Kulkus was allegedly more "aggressive" in her criticism of plaintiff's errors was, no doubt, irritating behavior.  But it is not actionable under Title VII.  *See Meder v. City of New York*, No. 05 CV 919, 2007 WL 1231626, at *4 (E.D.N.Y. April 27, 2007).

Plaintiff claims that defendant also discriminated against him when his supervisor, Emily Kulkus revoked his Christmas week vacation during the 2008 holiday season after he had been previously approved.  According to plaintiff, Kulkus revoked it claiming that no two editors could be off at the same time.  When plaintiff approached Kulkus about this, she replied that it was an "oversight."

The Court notes, however, that plaintiff does not deny that he only was entitled to 25 vacation days in 2008 and he was granted 33.  And though part of his vacation request for the Christmas holiday in 2008 was revoked due to staff shortages according to defendant, plaintiff did take the day after Christmas off.  Plaintiff was also the only Copy Editor to take time off during the Thanksgiving, Christmas and New Year's Holiday period in 2008 and 2009.  "[T]he denial of a single vacation request, without any indication that there was an absolute prohibition against . . . taking any vacation time, is not a material adverse employment action."  *Chukwuka v. City of New York*, 795 F.Supp.2d 256, 261 (S.D.N.Y. 2011) (plaintiff requested four weeks of annual leave; while the full request was denied, plaintiff was allowed to take fifteen days of leave) (citations omitted).  Thus, the Court finds that revocation of part of plaintiff's Christmas week vacation request in 2008, when he was still able to take more his allotted days of vacation for the year, plus the day after Christmas off, is not an adverse employment action.

24

Based on the analysis *Galabya*, *supra,* the only claim asserted by plaintiff which could constitute an adverse employment action is his termination. Thus, he has demonstrated he is: a (1) member of a protected class; (2) in possession the required skills necessary for the job; and (3) suffered an adverse employment action when defendant terminated his employment. Still, however, plaintiff must show that the termination occurred under circumstances giving rise to an inference of discrimination. *See St. Mary's Honor Center*, 509 U.S. 502 at 506. A plaintiff may raise such an inference by showing that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group. *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, (1977); *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir. 1999) (inference of discrimination arises when individual of one race treated less favorably than those of another race who are similarly situated); *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 63 (2d Cir. 1997) (woman may prove inference of discrimination by showing similarly situated man treated differently); *Montana v. First Fed. Sav. and Loan Ass'n of Rochester*, 869 F.2d 100, 106 (2d Cir. 1989) (inference of discrimination arises when female employees are treated less favorably than comparable male employees).

As referenced above, plaintiff asserts that between November 2008 and April 2009, he was scrutinized more than his white colleagues and criticized more harshly for his errors which he states were actually less serious than the errors made by his white co-workers. Plaintiff claims that between 2008 and 2009, his department (CNY) was responsible for 191 published corrections. Of those published corrections, he claims he was only responsible for 3. Plaintiff asserts that seven of his white colleagues were responsible for a total of 54. Plaintiff's breakdown of the number of mistakes his white colleagues allegedly made during that same time period were as follows: Patti

McNeil Booth - 14 corrections; Mark Bialczak - 13 corrections; Peter Schaffer - 11 corrections; Amber Smith - 6 corrections; Emily Kulkus - 4 corrections; Laura Ryan - 3; Gina Chen -3 corrections.  Plaintiff argues that his errors were "minor" compared to and "not as egregious" as some of his white colleagues, who made repeated mistakes.  Plaintiff contends that his errors that warranted published corrections ranged from "running the wrong movie times to running a headline that didn't reflect the heart of story."  Moreover, "all of his errors were made while he was while rushing to complete a deadline."  Plaintiff asserts "these errors were not as egregious as some of the mistakes that his white colleagues made."

To wit, plaintiff states that he "never declared someone dead," like Laura Ryan did in an article about Pulitzer Prize winning author Frank McCourt.  Plaintiff "never placed wrong photos with a story," and was "never responsible for turning in a schedule of a major festival that reflected the previous year's events rather that the current year" as Weekend editor Peter Schaffer did.  Plaintiff asserts that during the DHR hearing, "Kulkus made excuses" for his white colleagues' errors while holding plaintiff responsible for his errors.

When considering whether a plaintiff has raised an inference of discrimination by showing that she was subjected to disparate treatment, the Second Circuit requires a plaintiff to show he was "similarly situated in all material respects" to the individuals with whom he seeks to compare himself.  *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) (citing *Shumway v. United Parcel Service*, 118 F.3d 60, 64 (2d Cir. 1997).  In *Shumway*, the Second Circuit adopted without discussion the Sixth Circuit's "all material respects" standard.  *See id.* (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)).  Moreover, in *Shumway*, the Court found that the plaintiff, who claimed she was forced to resign for violating an anti-fraternization policy, was not

similarly situated to the male co-workers she claimed violated the same policy, but who were not disciplined. *See id.* These co-workers and plaintiff had different supervisors, and at least one male manager who reported to the same supervisor as plaintiff was interviewed and ultimately resigned for violation of the policy. *See id.* Moreover, plaintiff presented no evidence that the alleged conduct of the comparators was similar to her conduct, which involved a long-term relationship with an hourly employee, harassing behavior and lying. *See id.* To satisfy *Shumway's* "all material respects" standard for being similarly situated, a plaintiff must show that her co-employees were subject to the same performance evaluation and discipline standards. *See Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 96 (2d. Cir. 1999). In addition, the *Shumway* standard requires a plaintiff to show that similarly situated employees who went undisciplined "engaged in comparable conduct." 118 F.3d at 64.

Here, it is undisputed that save for Peter Schaffer, none of the white employees plaintiff attempts to compare himself to concerning alleged errors made at the newspaper held the same job as he did of Copy Editor. Thus, from the outset, it is hard to imagine how any of these employees, other than Schaffer, could possibly be similarly situated for the purposes of establishing plaintiff's *prima facie* case. Moreover, even if the Court accepted plaintiff's bald assertion that all of these employees were similarly situated in terms of their job responsibilities, plaintiff still fails to meet the *Shumway* standard referenced above. Plaintiff goes to great lengths in his opposition papers to detail a number of errors made by his white counterparts at the newspaper. However, none of these employees made the same errors plaintiff made in this case which were serious enough to result in his termination. None of these employees were charged with a filing error that resulted in running the same syndicated columns twice in a row on consecutive days. More importantly, none of these

employees were charged with failing to stop using a faulty shortcut that led to making this same filing error and nearly running the same syndicated columns three times.

Plaintiff has provided the Court with nothing more than a "laundry list" of alleged errors made by his co-workers. Moreover, a number of the errors on this list occurred after his termination date. Utterly absent from the record are facts concerning the performance records of these allegedly similar employees, and disciplinary actions taken against them. Unlike the voluminous documents in the record concerning evaluation of plaintiff's job performance, there are no memos, notes or other indicia of how the other employees identified by plaintiff were handled by defendant. Plaintiff has not submitted a single factual allegation detailing how any of his supervisors disciplined him differently than any of the white employees he has referenced herein concerning errors. Thus, plaintiff has failed to demonstrate that these workers were "subject to the same standards governing performance evaluation" or that they "engaged in conduct similar to his." *Mazzella v. RCA Global Commc'ns, Inc.*, 642 F. Supp. 1531, 1547 (S.D.N.Y. 1986), *aff'd* 814 F. 2d 653 F.2d 653 (2d Cir. 1987).

With respect to Peter Schaffer, who did have the same job as plaintiff, plaintiff asserts that "defendant admits that Mr. Schaffer's personnel file does not contain any documents regarding 'repeated' or 'egregious' mistakes' or 'errors' that he made in performing his job as a Copy Editor." It is hard to conceive of how plaintiff characterizes this acknowledgment as useful in proving his case. If Schaffer never made any repeated or egregious errors, then clearly, defendant would have no reason to discipline him. However, plaintiff also claims that "Schaffer himself admitted he made errors while performing his job as a Copy Editor." Review of the errors allegedly made by Schaffer demonstrates that they were not the same type of errors made by plaintiff. Specifically,

28

plaintiff asserts that Schaffer put the wrong caption on photos three times in March and April 2008. Plaintiff also claims that Schaffer published the wrong schedule for the Latin Festival in the Weekend magazine section in August 2009. To wit, the schedule was from 2008 and included events happening Sunday when the 2009 schedule was a Saturday only festival. Finally, plaintiff claims that Schaffer listed the wrong "headliner" for the Blues, Brews and BBQ Festival at the New York State Fairgrounds for Friday May 22, 2009. With respect to the latter two errors, however, these post-date plaintiff's termination on April 29, 2009. Consequently, they are irrelevant to the present motion.

Insofar as the three instances where Schaffer incorrectly captioned photos, as discussed above, these are not the same type and quality of errors as the ones charged to plaintiff in this case. In any event, there is no such admission by defendant or Schaffer in the record that Schaffer made any "errors." Plaintiff asserts that the source for his claim of the admission is the DHR file, a "public record." Although plaintiff's complaint references his filing with the DHR, he did not attach any documents relating thereto. Plaintiff testified at his deposition that after reviewing all of the evidence, and conducting an investigation and hearing, the DHR issued a determination of "no probable cause" on April 9, 2010. Arguably, the DHR complaint, determination, and investigatory file are integral to plaintiff's claims if they substantiate his argument that he was held to a higher standard than his similarly situated white colleague, Mr. Schaffer. In the face of a motion for summary judgment to dismiss plaintiff's complaint for failure to state a *prima facie* case of employment discrimination based on race, plaintiff should have attached whatever documents he deemed relevant or critical from the DHR investigation and proceedings. Instead, he simply claims that defendant and/or Schaffer admitted Schaffer made errors and was not counseled or

reprimanded.[4]  In the absence of record evidence demonstrating how plaintiff was "similarly situated in all material respects" to Schaffer, *Graham v. Long Island R.R.*, 230 F.3d at 39 and "subject to the same standards governing performance evaluation," *Mazzella*, 642 F. Supp. at 1547, plaintiff cannot establish a disparate treatment claim as a matter of law.  Thus, plaintiff has failed to set forth a *prima facie* case of employment discrimination based upon race.

Furthermore, even assuming that plaintiff had made out a *prima facie* case, defendant has clearly met its burden of articulating a legitimate, nondiscriminatory reason for its actions, i.e., plaintiff's poor work performance and record of persistent errors.[5]  Plaintiff admits making the errors that are the basis for defendant's termination decision; he admits that he was warned if he made further errors that he would be terminated; and he admits that he made the same filing error by using the same faulty shortcut he had pledged to stop using but used anyway because he felt rushed.

If the defendant proffers a legitimate, nondiscriminatory reason for a challenged employment action, "the presumption raised by the *prima facie* case is rebutted, and drops from the case." *St. Mary's*, 509 U.S. at 507 (internal quotations and citations omitted).  "The plaintiff then

---

[4]

Plaintiff also claims that Emily Kulkus "made excuses" for his white co-workers in the DHR hearing.  Assuming without deciding that such a claim is even relevant to the Court's inquiry, plaintiff was obligated to obtain the records from the state administrative proceeding to substantiate this allegation.

[5]

Once a plaintiff has established a *prima facie* case, the burden of production shifts to the employer to rebut this presumption by articulating a legitimate, nondiscriminatory reason for its actions.  *Fisher v. Vassar College*, 114 F.3d 1332, 1335-36 (2d Cir.1997) ( *en banc* ) (" *Fisher III* "), *cert. denied*, 522 U.S. 1075 (1998).  The defendant's burden of production also is not a demanding one; he need only offer such an explanation for the employment decision. *See Fisher III*, 114 F.3d at 1336.

has the opportunity to demonstrate 'that the proffered reason was not the true reason for the employment decision,' and that race was." *Fisher III*, 114 F.3d at 1336 (quoting *St. Mary's*, 509 U.S. at 507-08). The plaintiff's opportunity to demonstrate that the employer's proffered reason was false now merges with her ultimate burden to persuade the trier of fact that she has been the victim of intentional discrimination (i.e., that an illegal discriminatory reason played a motivating role in the adverse employment decision). *See St. Mary's*, 509 U.S. at 516-17; *Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 256 (1981); *Fisher III*, 114 F.3d at 1337; *see also Hollander v. American Cyanamid Co.*, 172 F.3d 192, 200 (2d Cir. 1999).

In this case, plaintiff alleges that defendant's position that dismissal was due to job performance issues is "standard pre-text" for their discriminatory actions against him. Plaintiff says he did not want to believe that after 21 years his employer was setting him up for corporate failure based on his race. Plaintiff asserts it was a "hard pill to swallow" but he "had to face the reality' of "what [he] had fallen victim to." However, on the present record, there is simply no evidence demonstrating that defendant's proffered reasons for terminating plaintiff are false. Plaintiff simply disagrees with the seriousness of the errors that he made and whether he should have been terminated for them. Although plaintiff acknowledged that defendant considered these errors to be "serious" errors at the time they occurred, he chooses to believe they were not serious errors and that defendant merely "trumped" them up to cover up his termination. Plaintiff , however, has failed to submit evidence in support of his claim of "trumped up" charges. Plaintiff also fails to see any reasonable connection between errors made on the job and work performance. He states he was "not terminated for poor performance." Rather, he claims he was terminated "due to errors." Even assuming that the errors plaintiff was continually making were not serious as he

31

claims, he made the same errors time and time again even though he pledged to stop making them. To wit, he pledged to stop using the faulty filing shortcut that led to the same syndicated columns appearing in the paper on consecutive days. However, it was apparent that plaintiff continued using the same flawed shortcut even after he made this mistake twice - in November 2008, February 2009 - and was reprimanded. Plaintiff once again acknowledged his flawed reliance on a misguided shortcut and pledged to avoid the same mistake in the future all to no avail because the same exact thing happened a third time in April 2009. In the employment world, most reasonable people would not be surprised to learn that their "job performance" is negatively impacted by increased errors, whether they are considered minor or serious. Plaintiff apparently did not or would not understand this despite warnings from defendant:

> Q:      [W]hat I'm just trying to get at is whether -- there wasn't a formal written evaluation process?
>
> A .     No.
>
> Q.      Did you get kind of, then, more informal kind of counseling verbally about your job and how you are doing?
>
> A.      There were meetings in regards to errors, but not counseling or issues regarding job performance.
>
> Q .     Okay.  Do you equate an error with job performance?
>
> A.      No, I do not.
>
> Q .     So, if you make an error in your job, that means that has nothing to do with your job performance?
>
> A.      It just confirms that you 're human.
>
> Q.      Errors confirm that you 're human?  They don't have anything to do with your job performance?
>
> A.      Well, it could be related if it's something that's done over time,

which there's plenty of folks at the paper that repeat errors over time.

Q.      Did you ever get anything in writing that told you you need to improve your performance on your job?

A.      No, I did not.

Q.      Did anybody tell you verbally that you needed to?

                        . . .

A.      No.

Q.      Nobody ever told you that? But people discussed errors with you? Discussed errors, which is protocol. Did they want you to fix the errors?

A.      No.  Well, the error was already made, so they wanted to do preventative measures to not repeat the error.

Q.      So, did they help you -- explain to you how to take those measures so the error wouldn 't be made again?

A.      We discussed ways that both -- yes, that I could prevent the error and ways that the department could prevent the error.

Q.      And who held those kinds of meetings with you?

A.      Emily Kulkus.

Q.      Anybody else?

A.      Margie Chetney, she was the copy desk chief, so,

Q.      Anybody else?

A.      At one point, Melinda Johnson.

Q.      Anybody else you can think of?

A.      No.  Those were all supervisors - - those were all supervisory roles, so those were the ones we reported errors to.

Q.      Did any of their supervisors have any of these kinds of meetings with you?

A.      Mike Connor met with me and Emily, as well as Janis Barth.

Q.      So Emily, Marjorie, Melinda, Mike and Janis, right?

A.      Right, that was the protocol.
                                        . . .
A.      Any time an error is made by myself or anyone it would go through these people at one point or another.  So with my errors - - if I made an error, first it would go through Emily.  If she wasn't available, it would go through one of the others.
                                        . . .
Q.      And how about meetings with Mike Connor about errors?

A.      Mike Connor, those meetings - - I didn't meet with him until - - from what I recall, it was once in - - I think it was November 2008. I don't recall the first meeting, the date of that, but I know the next meeting after that was the February 13th meeting where my job was threatened.

Q.      And your job was threatened.  What do you mean by that?

A.      That if I repeated another error or made another error, I could lose my job.

Q.      And that's what Mike Connor told you at that meeting?

A.      Yes.

Q.      And that was in February 2009?

A.      Yes.

*See*, Plaintiff's Deposition Transcript, pp. 103-107, attached as Ex. E to Affirmation of Defendant's Counsel in Support of Summary Judgment.  Defendant argues that plaintiff was fired due to his inability to satisfactorily meet the expectations of his job, notwithstanding attempts by Kulkus and Connor to encourage his improvement.  Even assuming that plaintiff is correct when he asserts that the reason advanced for his termination by defendant is false - that Emily Kulkus   "singled" him out to be scrutinized and fired - there is still no evidence that unlawful discrimination was the "real"

34

reason for plaintiff's termination.  The law is well-settled that an employee alleging unlawful discrimination must show that an employer's proffered reasons for an adverse employment action are a pretext for discrimination.  *See Fisher III*, 114 F.3d at 1339.  "[A] reason cannot be proved to be a 'pretext for discrimination' unless it is shown **both** that the reason was false **and** that discrimination was the real reason."  *Id.* (emphasis in original).

Finally, as noted by defendant, it is undisputed[6] that the department plaintiff worked in is actually smaller now than when he was employed.  The duties he performed were absorbed by others in the CNY department and the Company did not replace plaintiff after he was terminated.  As a further matter, the uncontradicted proof clearly shows that a white Reporter named Diana LaMattina  was also terminated by Mr. Connor due to unsatisfactory job performance in July 2008.  Plaintiff simply denies this allegation.

After review of the entire record and the applicable law in this case, the Court finds there is no basis for a reasonable jury to conclude that race discrimination was the real reason or even a motivating factor in the decision to terminate plaintiffs' employment.  Consequently, this claim must be dismissed.

C.    Retaliation

Plaintiff also asserts a claim of retaliatory discharge under Title VII which requires the

_____

[6]

The Court uses the word "undisputed" fully cognizant that plaintiff "denies" these allegations in his opposition to defendant's Statement of Undisputed Facts.  Plaintiff does so, however, without any specific citations to the record as required by Local Rule 7.1 (a) (3).  A pro se litigant is not excused from following the procedural requirements of summary judgment.  *See Govan,* 289 F. Supp.2d. at 295 (citing *Showers v. Eastmond*, No. 00 CIV. 3725, 2001 WL 527484, *2 (S.D.N.Y. May 16, 2001)).  Specifically, "a pro se party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin*, 902 F.Supp. 424, 429 (S.D.N.Y.1995) (quoting *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir.1991)).

plaintiff to show "(1) participation in a protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action." *Tomka v. Seiler Corp*., 66 F.3d 1295, 1308 (2d Cir. 1995); *see also Kotcher v. Rosa & Sullivan Appliance Ctr., Inc*., 957 F.2d 59, 64 (2d Cir. 1992). Upon such a showing, the defendant must demonstrate legitimate reasons for its actions, whereupon the plaintiff bears the burden of showing that the defendant's explanations are pretext for the true discriminatory motive. *See Tomka*, 66 F.3d at 1308. Plaintiff's *prima facie* case of retaliation is flawed in a number of respects.

In the first instance, plaintiff cannot meet the either element of having engaged in a statutorily "protected activity" that was known to defendant." In this case, plaintiff relies on the two letters that he turned in on his last day of employment, just prior to being terminated, in which he complained of "unfair treatment" as his "protected activity." However, neither of the two letters mention anything about plaintiff's race or racial discrimination or even employment discrimination. Plaintiff admitted in his deposition that he did not mention race in the letters because he "assumed" his supervisors knew he was raising concerns about his race simply based on the fact that he was black.

With respect to the first element, participation in protected activity, a plaintiff need not establish that the conduct he opposed was actually a violation of Title VII, but only that he possessed a "good faith, reasonable belief that the underlying employment practice was unlawful" under that statute. *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp*., 136 F.3d 276, 292 (2d Cir. 1998) (citing *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996) (internal quotation marks omitted); *see also Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d

at 593. The reasonableness of the plaintiff's belief is to be assessed in light of the totality of the circumstances. *Reed*, 95 F.3d at 1178. As to the second element, implicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII. *See Galdieri-Ambrosini*, 136 F.3d at 292.

Plaintiff contends that the "truth is" that on the day he submitted a letter to Human Resources complaining about how he was being treated when he made mistakes versus how others (his white colleagues) were being treated, Mike Connor called him into his office at the end of his shift. Plaintiff states that Connor "end[ed] their conversation and plaintiff's career at the paper by saying that 'It's best that we part ways.' " Assuming that plaintiff genuinely believed himself to be the victim of discrimination on the basis of his race at the time he wrote the letters, the Court concludes that the evidence is insufficient to support his claim of retaliation. After perusing plaintiff's letters, no reasonable person could conclude that at the time plaintiff wrote the two letters at issue, he believed he was the victim of a employment discrimination based on race. To wit, plaintiff never mentions the words "race," "racial," "black," "white," or "discrimination" anywhere in the two letters. Thus, plaintiff's "complaints" to defendant in his letters did not state that plaintiff viewed defendant's actions as based on his race, and there was nothing in his vaguely worded "protests" that could reasonably have led the Company to understand that racial animus was the nature of his objections. *See Galdieri-Ambrosini*, 136 F.3d at 292; *Lapsley v. Columbia Univ.-Coll. of Physicians and Surgeons*, 999 F.Supp. 506, 525 (S.D.N.Y. 1998) ("casual and vague nature of remark to plaintiff's supervisor, fact that she never articulated basis for her belief of discrimination, and that "there was no semblance of [race]-oriented motivation in the events" was

not reasonable even if she had a good faith basis for her belief of discrimination).  On this basis, the Court finds that plaintiff's retaliatory discharge claim must fail as a matter of law.

## IV.    CONCLUSION

Based on the foregoing, it is hereby

ORDERED that defendant's motion for summary judgment dismissing the complaint (Dkt. No. 28) is GRANTED; and it is further

ORDERED that the complaint is hereby dismissed with prejudice.

IT IS SO ORDERED.

Date:    September 26, 2013

**Norman A. Mordue**
**Senior U.S. District Judge**